UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs. INDICTMENT

JONATHAN WILLIAM DECKER, D.O.,

Defendant.
_______________________________________/

The Grand Jury charges:

## General Allegations

At times material to this Indictment:

### A. The Controlled Substances Act

1. The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 801 *et seq.*, and its implementing regulations governed the manufacture, distribution, and dispensation of controlled substances in the United States. With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance or conspire to do so.

2. The CSA and its implementing regulations set forth which drugs and other substances were defined by law as "controlled substances," and assigned those controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision.

3. A controlled substance assigned to Schedule II had a high potential for abuse, was highly addictive, and had a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions. Abuse of a Schedule II controlled substance could have led to severe psychological or physical dependence.

4. Pursuant to the CSA and its implementing regulations, amphetamine-dextroamphetamine was classified as a Schedule II controlled substance. Amphetamine-dextroamphetamine (also referred to as "amphetamine salt combo" or "mixed amphetamine salt combo") was sold generically and under a variety of brand names, including "Adderall" or "Adderall XR." Methamphetamine hydrochloride was classified as a Schedule II controlled substance and sold under the brand name "Desoxyn." Other stimulants, including lisdexamfetamine (sometimes sold under the brand name "Vyvanse") and methylphenidate (sometimes sold under the brand name "Ritalin"), were also classified as Schedule II controlled substances.

5. Medical practitioners, such as nurse practitioners, medical doctors, and doctors of osteopathic medicine, who were authorized to prescribe controlled substances by the state jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States. 21 U.S.C. § 822(b) and 21 C.F.R. § 1306.03. Medical practitioners were required to register with the United States Drug Enforcement Administration ("DEA") to prescribe controlled substances. Upon application by the practitioner and approval

by the DEA, the DEA assigned a unique registration number to each qualifying medical practitioner. The DEA was responsible for enforcement of the CSA.

6. The CSA required all practitioners to be registered in the state in which the patients to which they were prescribing controlled substances were located, regardless of whether the prescribing was taking place via telemedicine. The CSA provided that every person who dispensed, or who proposed to dispense, any controlled substance was required to obtain from the DEA a registration issued in accordance with DEA rules and regulations, under Title 21, United States Code, Section 822(a)(2). Under the CSA, such dispensing included prescribing and administering controlled substances. *Id.* § 802(10). The DEA was permitted to register a person to dispense a controlled substance only if that person was permitted to do so by the jurisdiction in which his or her patients were located. *Id.* §§ 802(21), 823(f). Thus, unless an applicable exception applied, DEA regulations required a practitioner to obtain a separate DEA registration in each state in which a patient to whom he or she prescribed a controlled substance was located when the prescription was made, regardless of whether the prescription was made via telemedicine.

7. Title 21 of the Code of Federal Regulations, Section 1306.04 governed the issuance of prescriptions for controlled substances. It provided that, to be effective, a prescription for a controlled substance:

> must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is on the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the

> prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

8. In addition, Title 21 of the Code of Federal Regulations, Section 1306.03 required that valid prescriptions for controlled substances must be issued by an "individual practitioner" who is "[a]uthorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession."

**B. The Ryan Haight Act**

9. The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 was enacted to stem the increase in the use of controlled substances purchased on the Internet. The Act mandated, with limited exceptions, that the dispensing of a controlled substance by means of the Internet be predicated on a valid prescription issued by a practitioner who has conducted at least one in-person medical evaluation of the patient. The Act was codified in Title 21 of the United States Code.

10. Title 21, United States Code, Section 841(h) provided that it was unlawful to "knowingly or intentionally— writ[e] a prescription for a controlled substance for the purpose of delivery, distribution, or dispensation by means of the Internet in violation of [Title 21, United States Code,] [S]ection 829(e)."

11. Title 21, United States Code, Section 829(e)(1) provided that, "[n]o controlled substance that is a prescription drug as determined under the Federal

Food, Drug, and Cosmetic Act may be delivered, distributed, or dispensed by means of the Internet without a valid prescription."

12. Title 21, United States Code, Section 829(e)(2)(A) provided that in order for a prescription to be valid it had to be "issued for a legitimate medical purpose in the usual course of practice by— (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient; or (ii) a covering practitioner."

13. Title 21, United States Code, Section 829(e)(2)(B)(i) provided that an "in-person medical evaluation" was "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals."

14. Title 21, United States Code, Sections 829(e)(3) and 802(54) provided that the requirement of conducting at least one in-person medical evaluation did not apply in certain circumstances involving "the practice of telemedicine" where the Secretary of Health and Human Services ("HHS") has declared "a public health emergency" and it "involve[d] patients located in such areas, and such controlled substances, as the Secretary [of HHS], with the concurrence of the Attorney General, designate[d]." 21 U.S.C. § 802(54)(D).

15. Title 21, United States Code, Section 802(54) provided that "[t]he term 'practice of telemedicine' means, for purposes of this subchapter, the practice of medicine in accordance with applicable Federal and State laws by a practitioner (other than a pharmacist) who is at a location remote from the patient and is communicating with the patient, or health care professional who is treating the

patient, using a telecommunications system referred to in [S]ection 1395m(m) of [T]itle 42 ."

16. Title 42, United States Code, Section 1395m(m)(1) and implementing regulations, including Title 42, Code of Federal Regulations, Section 410.78, provided that a telecommunications system meant "multimedia communications equipment that includes, at a minimum, audio and video equipment permitting two-way, real-time interactive communication between the patient and distant site physician or practitioner," and "include[d] store-and-forward technologies that provide for asynchronous transmission of health care information" only in "telemedicine demonstration program conducted in Alaska and Hawaii."

17. On or about January 31, 2020, the Secretary of HHS declared a national public emergency under Title 42, United States Code, Section 247d as a result of the spread of the novel coronavirus COVID-19 within the United States.

18. In response to the COVID-19 Public Health Emergency as declared by the Secretary, pursuant to the authority under Section 319 of the Public Health Service Act (42 U.S.C. § 247d), the DEA granted temporary exceptions to the Ryan Haight Act and DEA's implementing regulations under Title 21, United States Code, Section 802(54)(D), thereby allowing the prescribing of controlled medications via telemedicine encounters—even when the prescribing practitioner had not conducted an in-person medical evaluation of the patient—in certain circumstances in order to prevent lapses in care.

19. These emergency flexibilities to limit the spread of COVID-19 allowed, during the pendency of the COVID-19 Public Health Emergency, the prescribing of controlled substances without first conducting an in-person examination only if all of the following conditions were met: the prescription was issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice; telemedicine communication was conducted using an audio-visual, real-time, two-way interactive communication system; and the practitioner was acting in accordance with applicable federal and state laws. *See* 21 C.F.R. § 1307.41 (effective through December 31, 2025).

**C. State Prescription Drug Monitoring Programs**

20. Many states operated Prescription Drug Monitoring Programs ("PDMPs") to curb the abuse of prescribed controlled substances. In general, PDMPs required pharmacies to report controlled substance prescriptions to a centralized state-maintained database. Such databases enabled prescribers to review a patient's controlled substance prescription history to look for "red flags," such as, for example, when a patient had prescriptions for the same controlled substance from multiple prescribers at the same time. Some states required prescribers to review a PDMP database for a patient's controlled substance prescription history before prescribing a controlled substance.

21. Outside of limited exceptions, Michigan law required prescribers to obtain and review a report from Michigan's PDMP database before prescribing a controlled substance to a patient. *See* Mich. Comp. Laws § 333.7303a(4).

22. Similarly, outside of limited exceptions, Pennsylvania law required prescribers to query Pennsylvania's PDMP database "for each patient the first time the patient is prescribed a controlled substance by the prescriber" or "if a prescriber believes or has reason to believe, using sound clinical judgment, that a patient may be abusing or diverting drugs." 35 Pa. Stat. § 872.8(a). Pennsylvania law also required prescribers to "indicate the information obtained from the [PDMP] system in the patient's medical record" for first time patients. *Id.* § 872.8(b).

23. Additionally, outside of limited exceptions, California law required prescribers to consult the state's PDMP database "to review a patient's controlled substance history for the past 12 months before prescribing a Schedule II, Schedule III, or Schedule IV controlled substance to the patient for the first time and at least once every six months thereafter if the prescriber renews the prescription and the substance remains part of the treatment of the patient." Cal. Health & Safety Code § 11165.4(a)(1)(A)(i).

24. Starting on September 30, 2021, an Ohio administrative rule acknowledged that the "accepted and prevailing minimal standards of care require that when prescribing or personally furnishing a reported drug," including controlled substances, "a physician shall take into account all of the following: (a) The potential for abuse of the reported drug; (b) The possibility that use of the reported drug may lead to dependence; (c) The possibility the patient will obtain the reported drug for a nontherapeutic use or distribute it to other persons; and (d) The potential existence of an illicit market for the reported drug." Ohio Administrative Code Rule 4731-11-

11(B). Outside of limited exceptions, the Ohio administrative rule required controlled substance prescribers to obtain and review a PDMP report for patients whose treatment lasted more than 90 days or when certain "red flags" pertained to a patient, such as a history of drug abuse or dependency or a history of drug-related arrests. *Id.* Rule 4731-11-11(C).

**D. The Defendant and Relevant Entities and Individuals**

25. Defendant JONATHAN WILLIAM DECKER was a resident of Kent County in the Western District of Michigan. DECKER was a Doctor of Osteopathic Medicine licensed in multiple states, including Michigan, Pennsylvania, California, and Ohio. DECKER maintained a DEA registration number and was authorized to prescribe Schedule II controlled substances in some states, including Michigan, Pennsylvania, California, and Ohio.

26. Okay Health, Inc., was a Delaware corporation that was incorporated on or about February 26, 2020, and did business as "Okay Health" and "Done." In or around April 2021, the company was renamed Done Global, Inc. (collectively, with its predecessor name Okay Health, Inc., referred to herein as "Done Global").

27. Done Health, P.C., was a California corporation that was incorporated on or about August 7, 2020. Done Medical CA, P.C., was a California corporation that was incorporated on or about January 10, 2024. Together, Done Global, Done Health, P.C., and Done Medical CA, P.C., are collectively referred to herein as "Done."

28. On or about March 10, 2024, Done Medical CA, P.C., changed its name to Mindful Mental Wellness, P.C.

29. Done was a self-proclaimed "digital health company" that operated on a subscription-based model where individuals ("Done members") paid a monthly fee to Done. Done advertised that it provided online diagnosis, treatment, and refills of medication for attention deficit hyperactivity disorder ("ADHD"). Done's principal place of business was within the Northern District of California.

30. Done maintained a network of medical professionals ("Done Prescribers") that included doctors and nurse practitioners who Done paid to diagnose Done members with ADHD and to write prescriptions for controlled substances, including Adderall and other stimulants.

31. David Brody was a Done executive. Brody was also a psychiatrist who maintained a DEA registration number and was authorized to prescribe controlled substances in the State of California.

32. DECKER was a Done Prescriber from February 2021 through at least November 2023 and received over $1,000,000 in exchange for prescribing over two million pills of Adderall and other stimulants to Done members.

**<u>COUNT 1</u>**
**(Conspiracy to Distribute and Dispense Controlled Substances)**

**A. Introduction**

33. The allegations contained in Paragraphs 1 to 32 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

**B. Conspiracy**

34. From in or around February 2021, and continuing through at least November 2023, in the Southern Division of the Western District of Michigan, and elsewhere, the defendant,

JONATHAN WILLIAM DECKER, D.O.,

did knowingly and intentionally combine, conspire, confederate, and agree with Brody and others associated with Done, known and unknown to the Grand Jury, to knowingly and intentionally distribute and dispense mixtures and substances containing a detectable amount of controlled substances, including amphetamine-dextroamphetamine, lisdexamfetamine, methylphenidate, methamphetamine hydrochloride, and other stimulants, Schedule II controlled substances, not for a legitimate medical purpose in the usual course of professional practice, in violation of Title 21, United States Code, Section 841.

**C. Purpose of the Conspiracy**

35. It was the purpose of the conspiracy for DECKER, Brody, and others at Done to unlawfully enrich themselves by knowingly: (a) providing Done members with prescriptions for Adderall and other stimulants that were not for a legitimate medical purpose in the usual course of professional practice; (b) enabling Done

members to obtain Adderall and other stimulants from pharmacies; (c) increasing the number of Done members, monthly subscription fees paid to Done, and payments to DECKER; (d) concealing and disguising the unlawful prescription of Adderall and other stimulants; and (e) diverting proceeds of the conspiracy for their personal use and benefit, for the use and benefit of others, and to further the scheme.

**D. Manner and Means of the Conspiracy**

36. The manner and means by which DECKER and others sought to accomplish the purpose and object of the conspiracy included, among other things, the following:

a. Done acquired thousands of Done members by, among other things, spending tens of millions of dollars on deceptive social media advertisements, including intentionally targeting drug-seeking patients, and advertising that members could obtain easy access to prescriptions for Adderall and other stimulants in exchange for payment of a monthly subscription fee to Done.

b. DECKER and others agreed with Brody and others, on behalf of Done, to work as independent contractors for Done and were paid to diagnose Done members with ADHD and issue prescriptions for Adderall and other stimulants regardless of whether the prescriptions were for a legitimate medical purpose in the usual course of professional practice.

c. DECKER and others obtained confidential patient information for thousands of Done members to allow DECKER to write prescriptions for Adderall and other stimulants to Done members.

d. While working at Done, acting for the benefit of himself and Done, and in the course and scope of the work that he was paid by Done to perform, DECKER knowingly:

i. ordered Adderall and other stimulants for Done members with whom he lacked a pre-existing practitioner-patient relationship, without an examination, and based solely on a short video or audio communication and limited patient intake documents, or without any video or audio communication at all. DECKER and Done provided few, if any, medical treatment options besides prescribing Adderall and other stimulants.

ii. ordered Adderall and other stimulants for Done members knowing that Done members (i) did not meet the Diagnostic and Statistical Manual of Mental Disorders (DSM)-V criteria for diagnosing ADHD; (ii) posed a risk of diversion; and (iii) were provided dosages, directions, combinations, or quantities of medications beyond those normally prescribed.

iii. agreed with Done and others that, after an initial consultation with a Done member, DECKER would be paid solely based on "patient load" (the number of Done members for whom DECKER wrote prescriptions each

month) and would not be paid for any patient consultation, time, or medical services that he provided to Done members.

iv. signed monthly prescriptions for Done members, after an initial consultation, for Adderall and other stimulants that were not for a legitimate medical purpose in the usual course of professional practice by doing so (i) without an in-person examination and without seeing, speaking to, and/or otherwise engaging in audio or video communication with Done members; and (ii) without determining the Done members' medical need for the prescriptions. Done paid DECKER and others to write prescriptions for Done members whom DECKER had never seen or had any prior telemedicine consultation with. As a result of Done's payment model and DECKER's "patient load" that at times exceeded 2,000 Done members, DECKER was paid over $1,000,000 during the time period of the conspiracy and in some months, Done paid DECKER more than $30,000 per month.

v. signed monthly prescriptions for Done members for Adderall and other stimulants, referred to him by Done

knowing that they were not for a legitimate medical purpose in the usual course of professional practice.

e. DECKER and others falsified, fabricated, altered, and caused the falsification, fabrication, and alteration of patient files, prescriptions, pre-authorizations, and other records, all to support prescriptions that were not for a legitimate medical purpose in the usual course of professional practice.

All in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).

**COUNTS 2-11**
**(Distribution and Dispensing of Controlled Substances)**

37. The allegations contained in Paragraphs 1 through 32 and 35 through 36 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

38. On or about each of the dates set forth below, in the Southern Division of the Western District of Michigan, and elsewhere, the defendant,

JONATHAN WILLIAM DECKER, D.O.,

did knowingly and intentionally distribute and dispense, and aid or abet in the distribution or dispensing of, mixtures and substances containing a detectable amount of the listed Schedule II controlled substances, not for a legitimate medical purpose in the usual course of professional practice:

| **Count** | **Done Member** | **Approx. Date of Prescription** | **Controlled Substance** |
|---|---|---|---|
| **Two** | Patient 1 | July 26, 2021 | Adderall 30 mg tablets 3x per day |
| **Three** | Patient 1 | August 20, 2021 | Adderall 30 mg tablets 3x per day and Adderall XR 10 mg tablets 1x per day |
| **Four** | Patient 1 | December 7, 2021 | Adderall 30 mg tablets 3x per day |
| **Five** | Patient 1 | February 17, 2022 | Methamphetamine HCL 5 mg tablets 2x per day and Adderall 30 mg tablets 3x per day |
| **Six** | Patient 1 | November 8, 2022 | Adderall 30 mg tablets 3x per day |

| Count | Done Member | Approx. Date of Prescription | Controlled Substance |
|---|---|---|---|
| **Seven** | Patient 2 | October 19, 2021 | Vyvanse 40 mg capsule 1x per day |
| **Eight** | Patient 2 | November 15, 2021 | Vyvanse 50 mg capsule 1x per day |
| **Nine** | Patient 2 | December 10, 2021 | Vyvanse 60 mg capsule 1x per day |
| **Ten** | Patient 2 | January 18, 2023 | Vyvanse 70 mg capsule 1x per day |
| **Eleven** | Patient 3 | October 26, 2023 | Adderall 15 mg tablets 2x per day |

Each in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.

## FORFEITURE

**(Conspiracy to Distribute and Dispense Controlled Substances (Count 1); Distribution and Dispensing of Controlled Substances (Counts 2-11))**

The allegations contained in Counts One through Eleven are incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of 21 U.S.C. § 853.

Upon conviction of a violation of 21 U.S.C. §§ 841(a)(1) or 846, the defendant shall forfeit to the United States, pursuant to 21 U.S.C. §§ 853(a)(1) and (2), any property constituting, or derived from, any proceeds the defendant obtained, directly or indirectly, as a result of such violation, and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. The property to be forfeited includes, but is not limited to, the following:

1. MONEY JUDGMENT: a sum of money, which represents the proceeds the defendant obtained, directly or indirectly, from the violation.

2. SUBSTITUTE ASSETS: If any of the property described above, as a result of any acts or omissions of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property, which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p).

21 U.S.C. § 853(a)
21 U.S.C. § 853(p)
21 U.S.C. § 841(a)(1)
21 U.S.C. § 846

A TRUE BILL

[ /s/ Redacted ]
GRAND JURY FOREPERSON

ANDREW B. BIRGE
Acting United States Attorney

LORINDA LARYEA
Acting Chief, Fraud Section
U.S. Department of Justice

By: ______________________
RYAN K. ELSEY
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice